[Cite as *State v. Lash*, 2017-Ohio-4065.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 104310**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DAVERRICK J. LASH

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-596663-A

**BEFORE:** McCormack, P.J., E.T. Gallagher, J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** June 1, 2017

**ATTORNEY FOR APPELLANT**

Kimberly Kendall-Corrall
1497 E. 361 Street, Suite 3
Eastlake, OH 44095


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Brian Radigan
Maxwell Martin
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, P.J.:

{¶1} On January 30, 2015, a shooter gunned down 30-year-old William Burton ("victim") near the entrance of a bathroom at Club Fly High, a bar in Cleveland's east side. The bar was plagued with a history of crimes. Appellant Daverrick Lash ("appellant" hereafter) was identified by a witness several days later as the shooter. Another witness saw the shooter spit just before opening fire on the victim. A sample of what appeared to be spit collected near the shooting matched appellant's DNA. These two eyewitnesses wavered subsequently in their testimony at trial. Despite the wavering, the jury found appellant guilty of aggravated murder and other related offenses. On appeal, appellant argues the state presented insufficient evidence to prove that he was the shooter or that the murder was committed with prior calculation and design. After a review of the record and applicable law, we affirm his convictions.

{¶2} Six months after the shooting at Club Fly High, a grand jury indicted appellant for aggravated murder, murder, four counts of felonious assault,[1] two counts of inducing panic, and three counts of gun offenses. He pleaded not guilty to each count and was tried before a jury. At the lengthy trial, the state produced 17 witnesses. The defense did not present any witnesses. The state's key witnesses were three patrons at Club Fly High present on the night of the shooting: Jasmine Rogers, Kendra Mathis,

---

[1]At trial, the state dismissed the counts of felonious assault relating to three bar patrons Jasmine Rogers, Kendra Mathis, and Robert Bailey.

and Robert Bailey.   The testimony of the three reflects the following facts surrounding the shooting and its aftermath.

**Jasmine Rogers**

{¶3}   Jasmine Rogers testified that on the night of the incident, she arrived at Club Fly High between 12:30 a.m. and 1:00 a.m after drinking at several other bars.   The victim, whom she knew, was playing pool with a woman, later identified as Kendra Mathis.   At one point, while Rogers was talking with another friend by the bar stools, she saw a man with a gun standing about ten feet away.   She thought he was just showing the gun but then she heard six or seven gunshots.   She saw the victim, who was standing on one side of a pool table across from the bathroom, "dodge" toward the bathroom and fall.   She ran to help him.   His mouth was filling with blood and soon he stopped breathing.   She tried to perform CPR on him but could not revive him.   She testified that there was no argument or any kind of altercation prior to the shooting.   The shooting occurred ten minutes after she entered the bar.

{¶4}   Rogers testified that she went to the police station that night but was unable to identify the shooter from several photo lineups.   She acknowledged that when a police officer came to her house to show her a photo lineup five days later, she identified appellant as the shooter from the photo lineup.   Under cross-examination, however, Rogers wavered on her identification.   She stated that she "cannot" identify the person she circled in the photo lineup as the shooter because the shooting occurred well over a year ago.   She also stated that although she picked out appellant from the photo lineup,

she only saw the shooter's face from the side. She testified that she was now not sure whether the person she once identified as the shooter in the photo lineup was the shooter.

{¶5} Detective Kevin Fischbach was the "blind" administrator who showed Rogers the photo lineup at her house. He testified that she circled appellant's picture and that he wrote down the notation "this is the male whom shot victim" next to appellant's picture to reflect what Rogers said when identifying appellant from the photo lineup.

**Kendra Mathis**

{¶6} Kendra Mathis did not know the victim but played pool with the victim before he was shot. She admitted she had been drinking all night. Her testimony about the shooting was evasive and reflected her reluctance to testify for the state. She testified that when she came out of the women's restroom, "somebody spit and it went right across my face." She saw the person for a brief second. Soon after, she saw "a man" pull out a pistol. When she saw the pistol, she made her way toward the front door. She was facing the front door when she heard gunshots erupting behind her. She ran outside and then ran back to the bar to grab her coat. She and other bar patrons were then told to remain at the bar to be questioned by the police about the shooting.

{¶7} Mathis was unwilling to testify that the man who spat was the same person who pulled out a pistol. She would only acknowledge that when interviewed by the police, she mentioned she was almost spat upon before the shooting. When Mathis repeatedly insisted she did not know whether the person who spat in her direction was the shooter, the state asked the court to declare Mathis a hostile witness. The state then

asked her if she had told the police after the shooting she saw the person who almost spat on her pull a gun and shoot the victim. She claimed she did not remember. She admitted she did not want to be a witness at this trial because she was trying to mind her own business and to keep her family safe.

{¶8} In connection with the spit, Officer Matthew Nycz testified that the police officers taped off the perimeter of the shooting and blocked off an area where the officers were alerted to the presence of spit by the shooter. Detective James Raynard, a crime scene detective, testified that, based on information given to him by other officers, he found and collected two samples of what appeared to him to be saliva behind the pool table. The saliva was still wet when collected. Testimony from a forensic scientist and a forensic DNA analyst at the Cuyahoga County Medical Examiner's Office showed that, of the two suspected spit samples collected, one matched the victim's DNA. The second sample had a major and minor contributor. The major contributor matched appellant's DNA and the minor contributor was inconclusive due to insufficient information. The forensic scientist acknowledged that she did not perform a specific test to determine if the substance was saliva.

**Robert Bailey**

{¶9} Robert Bailey was at Club Fly High on the night of the incident. He admitted he had been drinking since 6:00 p.m. that night. He testified that he, the victim, and appellant, whom he knew as D.J., all knew each other. On that night, a group of four amateur rap singers, including appellant, met up at Club Fly High before

they went to a club called "2-1-6" to participate there at a rap show there.  The "2-1-6" club is located at E. 33rd Street and Lakeside, a mile and a half away and a seven-to-ten minute drive away from Club Fly High.  Although Bailey was not one of the performers, he and some friends went to "2-1-6" as well.  Bailey however was turned away from "2-1-6" because he did not have an ID with him.  Bailey was back at Club Fly High 20 or 30 minutes after he left "2-1-6."  Bailey testified he did not see appellant the rest of the evening.

{¶10} After Bailey returned to Club Fly High, he saw the victim  playing pool with Kendra Mathis.  At one point, the victim, pool stick in his hand, approached Bailey and asked him to get a drink for him from the bar.  Bailey walked to the bar to order some drinks.  All of a sudden, two shots went off.  The bar security guard ducked.  Bailey ducked too.  After a pause, four or five more shots went off.  Everyone was running.  He saw the victim's feet hanging out of the bathroom.  Bailey testified he did not hear any argument before the shooting.  The shooting came very suddenly.  He estimated the shooting took place 30 or 40 minutes after he returned to Club Fly High.

{¶11} Bailey testified that, when questioned by the police who quickly arrived at the scene, he told an officer that "the girl over there shooting pool with [the victim] should know everything."  Bailey identified the girl as Mathis and testified that she was "hysterical, crying, and looking nervous" when the police interviewed her.  Bailey also described the look on Mathis's face as "you ain't never seen nothing like that look,

shocked * * * and sad." He overheard her saying to an officer "the guy who did it spit over there" while pointing to the floor.

**The Investigation After the Shooting**

{¶12} Officer Gary Bartell testified that on the night of the shooting, he and his partner Matthew Nycz were patrolling an area near Club Fly High. They saw two black males running out of the club's front door in a panic, and they followed the fleeing men for about 50 yards in their patrol vehicle before the two men split. One man jumped over a fence, and the other man ran through a daycare center and disappeared. A pedestrian approached the officers and informed them of the shooting inside the bar. The officers went inside the bar and found the victim on the bathroom floor, with his body sticking out of the bathroom. The victim's friends were attending to him and trying to revive him, but he was unresponsive. Officer Bartell interviewed several people that night, including Bailey and Kendra Mathis.

{¶13} Officer Matthew Nycz testified similarly about the event but added that one of the two man tripped and fell into a tree lawn in the snow before he ran through the daycare center and disappeared. Officer Nycz later returned to the area and found a black semiautomatic handgun in the snow.

{¶14} Detective James Raynard testified that he collected six shell casings from the scene and it appeared six shots were fired. Dr. Dolinak, who performed an autopsy on the victim, testified that there were a total of five gunshot wounds — two shots to the

chest, one to the back, a superficial wound to the victim's hip, and one shot to the right hand. The order the wounds occurred was unknown, however.

{¶15} Sergeant Philip Christopher of the Cuyahoga County Sheriff's Department is in charge of inmate investigation in the county jail. One of his duties is to monitor the inmate phone calls. He authenticated a three-way phone call made by appellant to a female family member and a friend "Prez." The phone call was played before the jury. In the phone call, appellant mentioned the names of Jasmine Rogers and Kendra Mathis and spelled out their names. "Prez" was heard saying, "ain't even worried about the dude, we worried about those females."

{¶16} Appellant was found guilty of all counts and sentenced to life with the possibility of parole after 25 years.

{¶17} On appeal, he raises eight assignments of error for our review. They state:

> 1. The evidence cannot sustain the element of prior calculation and design for the conviction of aggravated murder pursuant to Ohio revised code 2903.01(A).
>
> 2. The evidence is not sufficient to sustain the convictions.
>
> 3. The trial court denied appellant due process under the fourteenth amendment due to the fact his conviction for aggravated murder with specifications was against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented at trial.
>
> 4. The trial court denied appellant due process under the fourteenth amendment by allowing prejudicially irrelevant evidence, denying appellant of a fair trial.

5. Appellant's right to the effective assistance of counsel was violated when trial counsel failed to object to jury instruction to appellant's prejudice, in violation of U.S. Constitution, amendment VI and Ohio Constitution, article I, section 10.

6. Appellant was denied his right to a fair trial when he was shackled in front of the jury in violation of U.S. Constitution amendment V, VI, VIII, IX, XIV and Ohio Constitution, article I, sections 1, 2, 5, 9, 10, 16 and 20.

7. Repeated acts of prosecutorial misconduct throughout the trial denied the appellant of a fair trial.

8. Cumulative errors deprived the appellant of his due process right to a fair trial.

We address these assigned errors out of order to best organize our analysis.

**Excited Utterance**

{¶18} The fourth assignment of error relates to Robert Bailey's testimony that he overheard Kendra Mathis say to a police officer "the guy who did it spit over there" while pointing to the floor. The trial court, after a sidebar conference outside of the presence of the jury, admitted Bailey's testimony as excited utterance under Evid.R. 803(2). Appellant claims the admission of that testimony was erroneous. We review a trial court's evidentiary rulings for abuse of discretion. *State v. Long*, 53 Ohio St.2d 91, 98, 372 N.E.2d 804 (1978).

{¶19} An excited utterance is a well-established exception to the hearsay rule. Evid.R. 803(2) defines an excited utterance as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." "'This exception derives its guaranty of trustworthiness from the fact that declarant is under such state of emotional shock *that his reflective processes*

*have been stilled*. Therefore, statements made under these circumstances are not likely to be fabricated.'" (Emphasis sic.)   *State v. Taylor*, 66 Ohio St.3d 295, 300, 612 N.E.2d 316 (1993), quoting Staff Note to Evid.R. 803(2).

{¶20} "The rationale for the admission of these statements is that the shock of the event causes the declarant's reflective process to be halted.  Thus, the statement is unlikely to have been fabricated and carries a high degree of trustworthiness."   (Citation omitted.)   *State v. Butcher*, 170 Ohio App.3d 52, 2007-Ohio-118, 866 N.E.2d 13, ¶ 27 (11th Dist.).

{¶21} The courts have applied a four-part test to determine the admissibility of a statement as an excited utterance:

> "(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement_ of declaration spontaneous and unreflective,
>
> (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous_excitement to lose a domination over his reflective faculties so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,
>
> (c) that the statement or declaration related to such startling occurrence or the circumstances of such starling occurrence, and
>
> (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration."

(Emphasis sic.) *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166, quoting *Potter v. Baker*, 162 Ohio St. 488, 124 N.E.2d 140 (1955), paragraph two of the syllabus.

**{¶22}** Appellant claims that the second element of the excited-utterance test was not satisfied in this case. He argues that Mathis's testimony showed that she was kept at the bar for questioning until 6 a.m. and, therefore, it could have been "hours" after the shooting when she made the statement to the police, while no longer under the stress of a startling occurrence.

**{¶23}** Regarding this element, it is well established that "[t]here is no per se amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be the result of reflective thought." *Taylor*, 66 Ohio St.3d at 303, 612 N.E.2d 316. In *Taylor*, the fact that 12 hours had passed from the assault to the time of the declaration was found not to be dispositive to the issue.

**{¶24}** Here, the statement made by Mathis and overheard by Bailey is a textbook example of an excited utterance. Mathis experienced a most startling event — the person she was playing pool with just moments earlier was suddenly and violently gunned down. Bailey's testimony reflects that when Mathis made the statement to an officer, her demeanor at the time was "hysterical," "crying," and "nervous." He described her facial expression as "you ain't never seen nothing like that look." Even if it was hours

after the shooting when Mathis made the statement to the police, Bailey's testimony shows that Mathis was still under such emotional shock that her statement was unlikely to have been fabricated and carried a high degree of trustworthiness.

{¶25} Appellant also argues that the fourth element of the excited-utterance test (an opportunity to observe personally the matter asserted in the statement) was not met because Mathis testified at trial that she was not certain if the person who pulled out a pistol was the same person who almost spat on her. Despite Mathis's reluctance to provide that specific testimony, her own testimony indicated she was nearby when the spitting occurred and soon after she saw a man pulling out a pistol. Thus, her own testimony reflects that she *had an opportunity* to personally observe the matter asserted in her statement — even as she claimed at trial she did not see clearly if the person who pulled the pistol was the person who spat. The trial court found Mathis's statement met the requisite elements of an excited-utterance. Affording deference to the trial court's evidentiary rulings, we do not find an abuse of discretion here.

**Impeachment**

{¶26} Under the fourth assignment of error, appellant also claims that Bailey's testimony of what he overheard Mathis stating to the police was inadmissible under Evid.R. 607 ("Impeachment"). He claims that the state improperly used Bailey's testimony to impeach Mathis, who claimed she did not remember making the statement to the police. Appellant argues that Evid.R. 607 would require the state to demonstrate

surprise and affirmative damage before the trial court could admit the statement.

Evid.R. 607 states:

> The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid.R. 801(D)(1)(a), 801(D)(2), or *803*.

(Emphasis added.)

{¶27} Appellant is correct that, pursuant to Evid.R. 607, a party calling the witness may impeach the witness by means of a prior inconsistent statement *only* upon a showing of surprise and affirmative damage. *State v. Darkenwald*, 8th Dist. Cuyahoga No. 83440, 2004-Ohio-2693, ¶ 28. Evid.R. 607, however, by its own plain language, does not apply to a statement qualified as a hearsay exception under Evid.R. 803 such as an excited utterance. *See State v. Bell*, 8th Dist. Cuyahoga No. 92308, 2009-Ohio-6302, ¶ 12 (statements admissible under Evid.R. 803 as excited utterances are exceptions to the requirements of Evid.R. 607); *State v. Martin*, 8th Dist. Cuyahoga No. 73842, 1999 Ohio App. LEXIS 1830, 12 (Apr. 22, 1999) (a witness's statement was admissible as an excited utterance under Evid.R. 803 and therefore Evid.R. 607 does not apply). As we have explained in the foregoing, Bailey's testimony regarding what he overheard Mathis stating to the police qualified as an excited utterance under Evid.R. 803 and, therefore, Evid.R. 607 is inapplicable here. The fourth assignment of error lacks merit.

**Sufficiency of Evidence**

**{¶28}** Under the second assignments of error, appellant argues the state produced insufficient evidence to prove he was the shooter. Under the first assignment of error, appellant argues the state produced insufficient evidence to prove the element of prior calculation and design for his conviction of aggravated murder. We address these sufficiency claims together.

**{¶29}** When considering a challenge of the sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

**Identity Evidence**

**{¶30}** The trial testimony reflects that Jasmine Rogers, who had identified appellant as the shooter in a photo lineup, did not identify appellant in court as the shooter. She also wavered on her previous identification, stating that she only saw the shooter from the side of his face. Kendra Mathis, who was overheard telling the police "the guy who did it spit over there," was equally evasive. She would only acknowledge

at trial that she was almost spat on by *a man* prior to the shooting and that she saw *a man* pull a pistol soon after. She was unwilling to testify that the two are the same person. Furthermore, there was no physical evidence linking appellant to the weapon involved in the shooting.

**{¶31}** The prosecution, however, presented a strong circumstantial case to establish the identity of the shooter. In contrast to circumstantial evidence, direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence, on the other hand, requires "the drawing of inferences that are reasonably permitted by the evidence." *Id.* *See also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("[c]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind"). "Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence — circumstantial evidence carries the same weight as direct evidence." *Cassano* at ¶ 13, citing *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). Circumstantial evidence and direct evidence inherently possess the same probative value. *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus.

**{¶32}** "'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.'" *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). "A conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 154-55, 529 N.E.2d 1236 (1988).

**{¶33}** In this case, Mathis, who had been with the victim before the shooting, testified she was almost spat on by a man before the shooting. She also testified she saw a man pulling a pistol out soon after, although she would not testify that these two men were one and the same. She was, however, overheard saying to the police on the night of the shooting that "the guy who did it spit over there" while pointing to the floor. The police found what appeared to be wet saliva in the area she pointed to, near the shooting. A sample collected had a major contributor that matched appellant's DNA. Although there is no direct evidence or eyewitness testimony that identified appellant as the man who spat before the shooting or the man who pulled the pistol and shot the victim, the substantial circumstantial evidence presented by the state, viewed in a light most in its favor, would convince the average mind that appellant was the shooter at Club Fly High on January 30, 2015.

**Prior Calculation and Design**

**{¶34}** Appellant also claims the state did not produce sufficient evidence to prove prior calculation and design, a necessary element for the offense of aggravated murder as defined in R.C. 2903.01(A).

**{¶35}** R.C. 2903.01(A) defines aggravated murder as purposely causing the death of another and with prior calculation and design. In its most recent decision on the issue of prior calculation and design, *State v. Walker*, Slip Opinion No. 2016-Ohio-8295, the Supreme Court of Ohio instructed that "[t]he elements of purpose and prior calculation and design are distinct, and the state must prove both to support a conviction of aggravated murder under R.C. 2903.01." *Id.* at syllabus. The court, again, stressed that there is no bright-line test that distinguishes between the presence or absence of prior calculation and design and each case turns on the particular facts of the case. *Walker* at ¶ 19; *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 148; *State v. Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82 (1997).

**{¶36}** The phrase "'prior calculation and design'" indicates "'an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim.'" *Walker* at ¶ 17, quoting Ohio Legislative Service Commission, Proposed Ohio Criminal Code: Final Report of the Technical Committee to Study Ohio Criminal Laws and Procedures, at 71 (1971). "Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *Walker* at ¶ 18.

**{¶37}** Shooting a person execution-style, however, may establish prior calculation and design. *Walker* at ¶ 21, citing *State v. Palmer*, 80 Ohio St.3d 543, 569-570, 687 N.E.2d 685 (1997) (after victim had fallen to the ground, defendant shot the victim in the head in an execution-style manner). "[I]f the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design." *State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2010-Ohio-2770, ¶ 19.

**{¶38}** *Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82, involved a killing at a bar. The defendant, who knew the victim, shot the victim several times after an argument. As the victim lay wounded on the floor, the defendant fired three or four more shots in the victim's back. The Supreme Court of Ohio explained that these circumstances showed "a scheme designed to implement the calculated decision to kill." *Walker,* Slip Opinion No. 2016-Ohio-8295, at ¶ 22. The court noted that pursuing and killing an incapacitated victim after an initial confrontation strongly indicates prior calculation and design. *Id.*, citing *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 45. *See also State v. Claytor*, 61 Ohio St.3d 234, 241, 574 N.E.2d 472 (1991) (defendant's act of pursuing the victim who was already wounded and killing him with a bullet in the face went beyond the impulse of the moment to constitute prior calculation and design); *Palmer* at 569-590 (after victim fell to the ground, defendant shot the victim in the head in an execution-style manner). In contrast, the victim in *Walker* was shot once during a

spontaneously erupted group fight, and the Supreme Court of Ohio held that such circumstances did not support an inference of prior calculation and design.

{¶39} In this case, the victim was shot in a cramped corner between the pool table and the restroom.   The shooting occurred suddenly and violently. The witnesses' testimony reflects that prior to the shooting, there was no argument or altercation between the victim and appellant, who knew each other.   Without any provocation, gunshots erupted.   Two volleys of shots separated by a brief pause were heard — Bailey testified he heard two shots, followed by a pause of five to seven seconds, and then another four or five shots.   The medical examiner testified the victim suffered two shots to the chest, one to the back, a wound to the hip, and one shot to the right hand.

{¶40} These circumstances reflect not a momentary impulse, but rather a scheme designed to implement a calculated decision to kill the victim.   After wounding the victim, who was helpless, unarmed, and had no way of escaping, appellant shot him in close range several more times to ensure his death.   The cold-blooded, execution-style manner of killing allowed the jury to infer a prior calculation and design.   *Walker* at ¶ 21.   Viewing the evidence in a light most favorable to the state, any rational trier of fact could have found the element of prior calculation and design beyond a reasonable doubt. The state presented sufficient evidence to support   appellant's conviction of aggravated murder.   The first and second assignments of error are without merit.

**Manifest Weight**

{¶41} Under the third assignment of error, appellant contends his conviction of aggravated murder is against the manifest of the evidence.

{¶42} While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest-weight challenge questions whether the state has met its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541. Unlike a challenge to the sufficiency of the evidence, which raises a question of law, a manifest weight challenge raises factual issues. When a defendant asserts that his conviction is against the manifest weight of the evidence, the court,

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). In evaluating a manifest-weight claim, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶43} Appellant argues his conviction of aggravated murder is against the manifest weight of the evidence because two key witnesses, Jasmine Rogers and Kendra Mathis, both admitted consuming alcohol prior to the shooting and both witnesses claimed at trial they did not clearly perceive the individual involved in the shooting. Appellant also

repeats his assertion under this assignment of error that there was no direct physical evidence linking him to the crime.

{¶44} Regarding the credibility of the two key witnesses, the trial transcript reflects that the defense counsel extensively cross-examined them regarding their alcohol consumption on the night of the shooting and their ability to perceive the event. The transcript also reflects that, despite cooperating with the police initially, they were evasive on the witness stand, reluctant to confirm their prior identification. In response to their reluctance, the state presented evidence of witness intimidation and also elicited testimony from Mathis that she wanted to "mind her own business" and keep her family safe. We are mindful that questions of witness credibility are primarily the province of the jury. It is the jury, not this court, that determines the credibility of the witnesses, and the jury was free to believe all, part, or none of the witnesses' testimony.

{¶45} Regarding the lack of direct physical evidence linking appellant to the shooting, as we have explained, circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned. All that is required of the jury is that it weighs all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. Having reviewed the entire record, we cannot say the jury in this case clearly lost its way and created such a manifest miscarriage of justice that appellant's aggravated murder conviction must be reversed and a new trial ordered. This is not an exceptional case in which the evidence weighs

heavily against the conviction warranting an exercise of our discretionary power to grant a new trial.    The third assignment of error is without merit.

**Ineffective Assistance of Counsel**

{¶46} Under the fifth assignment of error, appellant argues his trial court provided constitutionally ineffective assistance of counsel by failing to object to certain jury instructions.

{¶47} In order to establish a claim of ineffective assistance of counsel, appellant must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.    *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).    In Ohio, every properly licensed attorney is presumed to be competent and, therefore, a defendant claiming ineffective assistance of counsel bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985).    In evaluating whether the defendant has been denied the effective assistance of counsel, the test  is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done."    *State v. Hester*, 45 Ohio St.2d 71, 341 N.E.2d 304 (1976), paragraph four of the syllabus.

{¶48} Appellant's claim of ineffective assistance of counsel relates to the jury instructions on aggravated murder (Count 1) and the lesser included offense of murder under that count.    When the trial court instructed the jury on aggravated murder and the lesser included offense of murder, the court stated the following:

We are still on the first count [of aggravated murder], ladies and gentlemen.   If the evidence warrants it you may find the defendant guilty of an offense lesser than that that is charged in the indictment.   However, notwithstanding that right, it is your duty to accept the law as given to you by the court and if the facts and the law warrant a conviction of the offense charged in the indictment, namely aggravated murder, then it is your duty to make such finding uninfluenced by your power to find on a lesser offense. This provision is not designed to relieve you from the performance of an unpleasant duty.   It is included to prevent failure of justice if the evidence fails to so prove the original charge but does justify a verdict for the lesser offense.   The lesser included offense is murder as set forth in 2903.02(A).   You must consider the offense charged in the indictment.   If you find the state proved beyond a reasonable doubt all the essential elements of the offense of aggravated murder, your verdict must be guilty as charged.   *You will then continue your deliberations* to decide whether the state proved beyond a reasonable doubt the essential elements of the lesser included offense of murder.   If all of you are unable to agree on a verdict of either guilty or not guilty of the aggravated murder then you continue your deliberations to decide whether the state has proved beyond a reasonable doubt all of the essential elements of the lesser included offense of murder.

(Emphasis added.)

{¶49} These jury instructions reflect that trial court erroneously instructed the jury to proceed to deliberate on the lesser included offense of murder *even if* the jury had already found the defendant guilty of aggravated murder.   This was in error, because, if the jury finds a defendant guilty of aggravated murder, it need not deliberate on the lesser included offense of murder under the same count.   Neither the defense counsel nor the prosecutor, however, realized the error.

{¶50} After deliberation, the jury returned a verdict of guilty on *both* aggravated murder and the lesser included offense of murder on Count 1.   The trial court then realized its error in the jury instructions.   After a side bar conference, the court explained to the jury the error in the prior instructions and advised the jury that it need not deliberate

on the lesser included offense of murder if it found the defendant guilty of aggravated murder.    The court stated:

> [I]f you find that the state * * * did prove beyond a reasonable doubt all the essential elements of the offense of aggravated murder your verdict must be guilty. * * * You would then cease your deliberations as to whether or not the state prove beyond a reasonable doubt the essential elements of the lesser included offense.

The jury returned to the deliberation room for further deliberations on Count 1 based on the new instruction.    It returned a verdict of guilty on aggravated murder on that count.

{¶51} Given this record, we do not find counsel's performance deficient in failing to object to the initial erroneous jury instruction or that there is a reasonable probability that, were it not for counsel's error, the result of the trial would have been different. When the error in the initial jury instructions was discovered, the trial court promptly corrected the error and the jury re-deliberated based on the corrected instructions.    The defense was not prejudiced by any perceived ineffectiveness by counsel.    Appellant had a fair trial and substantial justice was done. The fifth assignment of error is without merit.

**Presence of Restraint**

{¶52} Under the sixth assignment of error, appellant claims he was denied a fair trial because he was shackled in view of the jury.    The record reflects that immediately after the initial guilty verdict on aggravated murder was read by the trial court, the sheriffs approached appellant and had him handcuffed at the table in accordance with the court's protocol.

{¶53} "[A] defendant in a criminal case has the right to appear at trial without shackles or other physical restraint except when the court, in the exercise of a sound discretion, determines such restraint is necessary for a safe and orderly progress of the trial." *State v. Carter*, 53 Ohio App.2d 125, 372 N.E.2d 622 (4th Dist. 1977). The usual practice is for a defendant to appear in court free of shackles because "the presence of restraints tends to erode the presumption of innocence that our system attaches to every defendant." *Id.*

{¶54} In this case, appellant was not shackled or handcuffed during the course of the trial. He was only handcuffed *after* the jury had determined he was guilty of aggravated murder beyond a reasonable doubt. At that point, the presumption of innocence had already been overcome. Although the jury reached its final verdict of aggravated murder after redeliberation (after the trial court advised the jury it need not consider the lesser included offense of murder once it found the defendant guilty of aggravated murder), appellant was not unduly prejudiced by the jury's brief exposure to him in handcuffs, because that exposure occurred after the jury had already found him guilty of aggravated murder. The sixth assignment of error is without merit.

**Prosecutorial Misconduct**

{¶55} Under the seventh assignment of error, appellant alleges three instances of prosecutorial misconduct during the closing argument: (1) the prosecutor remarked that Jasmine Rogers "[has] seen a man die and she knows who did it"; (2) the prosecutor stated that Kendra Mathis "[was] walking out of the women's bathroom when the shooter

spits across her"; and (3) the prosecutor characterized the sample collected as "fresh spit" even though a forensic scientist acknowledged that the sample was not specifically performed to determine that it was saliva and also acknowledged that the age of the sample could not be determined. Appellant points to these remarks without demonstrating how these remarks constitute prosecutorial misconduct.

{¶56} A prosecutor has a duty in closing argument to avoid efforts to obtain a conviction by going beyond the evidence before the jury. *State v. Smith*, 14 Ohio St.3d 13, 470 N.E.2d 883 (1984). "Prosecutors must avoid insinuations and assertions calculated to mislead. They may not express their personal beliefs or opinions regarding the guilt of the accused, and they may not allude to matters not supported by admissible evidence." *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). However, "'[i]n the tension and turmoil of a trial, both the prosecution and the defense have wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom.'" *Id.* at 165, quoting *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970). *See also State v. Ballew*, 76 Ohio St.3d 244, 667 N.E.2d 369 (1996) (the prosecutor is entitled to some latitude in closing argument as to what the evidence presented has shown).

{¶57} Our review of the purportedly improper remarks in context shows that these remarks were neither insinuations nor personal beliefs, but rather reflect reasonable inferences that may be drawn from the testimony. They fairly represented the state's interpretation of the evidence it presented. The prosecutor was entitled to latitude to

argue the state's interpretation of the evidence. *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 172.

{**¶58**} Even if the remarks were in any way improper, the transcript reflects the trial court reminded the jury after closing arguments that "what counsel says in closing argument includes their theories of the case. Not one word that is said by the attorneys in this case, not opening statements, not a question, not a comment, not closing arguments, constitute evidence. It's not to be considered as such." Thus, the trial court properly instructed the jury that it must decide the case based on the evidence and that closing arguments were not evidence. We presume that the jury followed the trial court's instructions. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 157. The seventh assignment of error is without merit.

**Cumulative Error**

{**¶59**} Under the eighth assignment of error, appellant argues the cumulative effects of all the errors he raises deprived him of a fair trial. We recognize that multiple errors that are separately harmless may, when considered together, violate a person's right to a fair trial. *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. Here, however, we have not found any errors committed as alleged by appellant. Therefore, the cumulative-error principle does not apply. *State v. Goff*, 82 Ohio St.3d 123, 140, 694 N.E.2d 916 (1998). Our review of the record reflects appellant received a fair and impartial trial. The eighth assignment of error is overruled.

{**¶60**} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
TIM McCORMACK, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
SEAN C. GALLAGHER, J., CONCUR