[Cite as *State v. Lash*, 2024-Ohio-6025.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 113766 |
| v. | : | |
| DAVERRICK LASH, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** December 26, 2024

Criminal Appeal from the Cuyahoga County Common Pleas Court
Case No. CR-15-596663-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Owen Knapp, Assistant Prosecuting Attorney, *for appellee.*

Patituce & Associates, LLC, Joseph C. Patituce, and Megan M. Patituce, *for appellant.*

ANITA LASTER MAYS, J.:

**{¶1}** Defendant-appellant Daverrick Lash ("Lash") appeals the trial court's decision denying his motion for application for DNA testing. We reverse the trial court's decision and remand to the trial court to provide its analysis for its decision.

**{¶2}** On February 16, 2016, Lash was found guilty of one count of aggravated murder, one count of murder, four counts of felonious assault, two counts of possessing a firearm in liquor permit premises, two counts of inducing panic, and one count of having weapons while under disability. The trial court sentenced Lash to an aggregate term of life in prison with the possibility of parole after 31 years.

## I.    Facts and Procedural History

**{¶3}** On January 30, 2015, Lash murdered William Burton ("Burton") at Club Fly High. Burton died from five gunshot wounds. Lash fled the club but was eventually arrested for the murder. After a trial, Lash was found guilty of Burton's murder.

**{¶4}** Lash appealed in *State v. Lash*, 2017-Ohio-4065 (8th Dist.) ("*Lash I*"), which stated the following facts:

> On January 30, 2015, a shooter gunned down 30-year-old William Burton ("victim") near the entrance of a bathroom at Club Fly High, a bar in Cleveland's east side. The bar was plagued with a history of crimes. Appellant Daverrick Lash ("appellant" hereafter) was identified by a witness several days later as the shooter. Another witness saw the shooter spit just before opening fire on the victim. A sample of what appeared to be spit collected near the shooting matched appellant's DNA. These two eyewitnesses wavered subsequently in their testimony at trial. Despite the wavering, the jury found appellant guilty of aggravated murder and other related offenses. On appeal, appellant argues the state presented insufficient

evidence to prove that he was the shooter or that the murder was committed with prior calculation and design. After a review of the record and applicable law, we affirm his convictions.

Six months after the shooting at Club Fly High, a grand jury indicted appellant for aggravated murder, murder, four counts of felonious assault, two counts of inducing panic, and three counts of gun offenses. He pleaded not guilty to each count and was tried before a jury. At the lengthy trial, the state produced 17 witnesses. The defense did not present any witnesses. The state's key witnesses were three patrons at Club Fly High present on the night of the shooting: Jasmine Rogers, Kendra Mathis, and Robert Bailey. The testimony of the three reflects the following facts surrounding the shooting and its aftermath.

Jasmine Rogers testified that on the night of the incident, she arrived at Club Fly High between 12:30 a.m. and 1:00 a.m. after drinking at several other bars. The victim, whom she knew, was playing pool with a woman, later identified as Kendra Mathis. At one point, while Rogers was talking with another friend by the bar stools, she saw a man with a gun standing about ten feet away. She thought he was just showing the gun but then she heard six or seven gunshots. She saw the victim, who was standing on one side of a pool table across from the bathroom, "dodge" toward the bathroom and fall. She ran to help him. His mouth was filling with blood and soon he stopped breathing. She tried to perform CPR on him but could not revive him. She testified that there was no argument or any kind of altercation prior to the shooting. The shooting occurred ten minutes after she entered the bar.

Rogers testified that she went to the police station that night but was unable to identify the shooter from several photo lineups. She acknowledged that when a police officer came to her house to show her a photo lineup five days later, she identified appellant as the shooter from the photo lineup. Under cross-examination, however, Rogers wavered on her identification. She stated that she "cannot" identify the person she circled in the photo lineup as the shooter because the shooting occurred well over a year ago. She also stated that although she picked out appellant from the photo lineup, she only saw the shooter's face from the side. She testified that she was now

not sure whether the person she once identified as the shooter in the photo lineup was the shooter.

Detective Kevin Fischbach was the "blind" administrator who showed Rogers the photo lineup at her house. He testified that she circled appellant's picture and that he wrote down the notation "this is the male whom shot victim" next to appellant's picture to reflect what Rogers said when identifying appellant from the photo lineup.

Kendra Mathis did not know the victim but played pool with the victim before he was shot. She admitted she had been drinking all night. Her testimony about the shooting was evasive and reflected her reluctance to testify for the state. She testified that when she came out of the women's restroom, "somebody spit and it went right across my face." She saw the person for a brief second. Soon after, she saw "a man" pull out a pistol. When she saw the pistol, she made her way toward the front door. She was facing the front door when she heard gunshots erupting behind her. She ran outside and then ran back to the bar to grab her coat. She and other bar patrons were then told to remain at the bar to be questioned by the police about the shooting.

Mathis was unwilling to testify that the man who spat was the same person who pulled out a pistol. She would only acknowledge that when interviewed by the police, she mentioned she was almost spat upon before the shooting. When Mathis repeatedly insisted she did not know whether the person who spat in her direction was the shooter, the state asked the court to declare Mathis a hostile witness. The state then asked her if she had told the police after the shooting she saw the person who almost spat on her pull a gun and shoot the victim. She claimed she did not remember. She admitted she did not want to be a witness at this trial because she was trying to mind her own business and to keep her family safe.

In connection with the spit, Officer Matthew Nycz testified that the police officers taped off the perimeter of the shooting and blocked off an area where the officers were alerted to the presence of spit by the shooter. Detective James Raynard, a crime scene detective, testified that, based on information given to him by other officers, he found and collected two samples of what appeared to him to be saliva behind the pool table. The saliva was still wet when collected. Testimony from a forensic scientist and a forensic DNA analyst at the Cuyahoga

County Medical Examiner's Office showed that, of the two suspected spit samples collected, one matched the victim's DNA. The second sample had a major and minor contributor. The major contributor matched appellant's DNA and the minor contributor was inconclusive due to insufficient information. The forensic scientist acknowledged that she did not perform a specific test to determine if the substance was saliva.

Robert Bailey was at Club Fly High on the night of the incident. He admitted he had been drinking since 6:00 p.m. that night. He testified that he, the victim, and appellant, whom he knew as D.J., all knew each other. On that night, a group of four amateur rap singers, including appellant, met up at Club Fly High before they went to a club called "2-1-6" to participate there at a rap show there. The "2-1-6" club is located at E. 33rd Street and Lakeside, a mile and a half away and a seven-to-ten minute drive away from Club Fly High. Although Bailey was not one of the performers, he and some friends went to "2-1-6" as well. Bailey however was turned away from "2-1-6" because he did not have an ID with him. Bailey was back at Club Fly High 20 or 30 minutes after he left "2-1-6." Bailey testified he did not see appellant the rest of the evening.

After Bailey returned to Club Fly High, he saw the victim playing pool with Kendra Mathis. At one point, the victim, pool stick in his hand, approached Bailey and asked him to get a drink for him from the bar. Bailey walked to the bar to order some drinks. All of a sudden, two shots went off. The bar security guard ducked. Bailey ducked too. After a pause, four or five more shots went off. Everyone was running. He saw the victim's feet hanging out of the bathroom. Bailey testified he did not hear any argument before the shooting. The shooting came very suddenly. He estimated the shooting took place 30 or 40 minutes after he returned to Club Fly High.

Bailey testified that, when questioned by the police who quickly arrived at the scene, he told an officer that "the girl over there shooting pool with [the victim] should know everything." Bailey identified the girl as Mathis and testified that she was "hysterical, crying, and looking nervous" when the police interviewed her. Bailey also described the look on Mathis's face as "you ain't never seen nothing like that look, shocked * * * and sad." He overheard her saying to an officer "the guy who did it spit over there" while pointing to the floor.

Officer Gary Bartell testified that on the night of the shooting, he and his partner Matthew Nycz were patrolling an area near Club Fly High. They saw two black males running out of the club's front door in a panic, and they followed the fleeing men for about 50 yards in their patrol vehicle before the two men split. One man jumped over a fence, and the other man ran through a daycare center and disappeared. A pedestrian approached the officers and informed them of the shooting inside the bar. The officers went inside the bar and found the victim on the bathroom floor, with his body sticking out of the bathroom. The victim's friends were attending to him and trying to revive him, but he was unresponsive. Officer Bartell interviewed several people that night, including Bailey and Kendra Mathis.

Officer Matthew Nycz testified similarly about the event but added that one of the two man tripped and fell into a tree lawn in the snow before he ran through the daycare center and disappeared. Officer Nycz later returned to the area and found a black semiautomatic handgun in the snow.

Detective James Raynard testified that he collected six shell casings from the scene and it appeared six shots were fired. Dr. Dolinak, who performed an autopsy on the victim, testified that there were a total of five gunshot wounds — two shots to the chest, one to the back, a superficial wound to the victim's hip, and one shot to the right hand. The order the wounds occurred was unknown, however.

Sergeant Philip Christopher of the Cuyahoga County Sheriff's Department is in charge of inmate investigation in the county jail. One of his duties is to monitor the inmate phone calls. He authenticated a three-way phone call made by appellant to a female family member and a friend "Prez." The phone call was played before the jury. In the phone call, appellant mentioned the names of Jasmine Rogers and Kendra Mathis and spelled out their names. "Prez" was heard saying, "ain't even worried about the dude, we worried about those females."

Appellant was found guilty of all counts and sentenced to life with the possibility of parole after 25 years. [1]

---

[1] The record reflects that Lash is eligible for parole after serving 31 years in prison. Journal Entry No. 93280676 (Mar. 11, 2016).

*Id.* at ¶ 1-17.

{¶5} Lash assigned eight errors for the court's review in *Lash I,* arguing that the evidence cannot sustain the element of prior calculation and design for the conviction of aggravated murder pursuant to R.C. 2903.01(A); the evidence is not sufficient to sustain the convictions; the trial court denied appellant due process under the Fourteenth Amendment due to the fact his conviction for aggravated murder with specifications was against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented at trial; the trial court denied appellant due process under the Fourteenth Amendment by allowing prejudicially irrelevant evidence, denying appellant of a fair trial; appellant's right to the effective assistance of counsel was violated when trial counsel failed to object to jury instruction to appellant's prejudice, in violation of U.S. Const. amend. VI and Ohio Const., art. I, § 10; appellant was denied his right to a fair trial when he was shackled in front of the jury in violation of U.S. Const. amend. V, VI, VIII, IX, XIV and Ohio Const. art. I, § 1, 2, 5, 9, 10, 16 and 20; repeated acts of prosecutorial misconduct throughout the trial denied the appellant of a fair trial; and cumulative errors deprived the appellant of his due process right to a fair trial.

{¶6} This court overruled all assignments of error. *Id.* at ¶ 60. Lash filed an appeal with the Supreme Court, and the Court declined to grant him jurisdiction in *State v. Lash*, 2018-Ohio-365 ("*Lash II*").

{¶7} On August 3, 2021, Lash filed a motion for application for DNA testing. On March 22, 2024, the trial court denied Lash's motion stating: "Defendant's motion for application for DNA testing is denied. Defendant has not shown that DNA testing would be outcome determinative. This court finds results would not be probative." Journal Entry No. 178469798 (Mar. 22, 2024).

{¶8} Lash filed this appeal assigning on error for our review:

The trial court abused its discretion in denying Lash's motion for application for post-conviction DNA testing.

## II. Standard of Review

{¶9} "We review the trial court's denial of an eligible offender's application for DNA testing for an abuse of discretion. R.C. 2953.74(A)." *State v. Conner*, 2020-Ohio-4310, ¶ 12 (8th Dist.), citing *State v. Ayers*, 2009-Ohio-6096, ¶ 12 (8th Dist.). An abuse of discretion occurs when "a court exercise[s] its judgment in an unwarranted way regarding a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

## III. Law and Analysis

{¶10} In Lash's sole assignment of error he argues that the trial court abused its discretion in finding that postconviction DNA testing would not be

outcome determinative. He argues there is a strong probability that no reasonable factfinder would have found Lash guilty if, in the context upon consideration of all available admissible evidence, a DNA test result excluding Lash from the casings and identifying the unknown DNA contributor from the firearm magazine had been presented at trial.

{¶11} Our analysis begins with determining if Lash is an eligible offender in accordance with R.C. 2953.71(F), which states: "'Eligible offender' means an offender who is eligible under division (C) of section 2953.72 of the Revised Code to request DNA testing to be conducted under sections 2953.71 to 2953.81 of the Revised Code." R.C. 2953.72(C) states:

> (1) An offender is eligible to request DNA testing to be conducted under sections 2953.71 to 2953.81 of the Revised Code only if all of the following apply:
>
> > (a) The offense for which the offender claims to be an eligible offender is a felony, and the offender was convicted by a judge or jury of that offense.
> >
> > (b) One of the following applies:
> >
> > > (i) The offender was sentenced to a prison term or sentence of death for the felony described in division (C)(1)(a) of this section, and the offender is in prison serving that prison term or under that sentence of death, has been paroled or is on probation regarding that felony, is under post-release control regarding that felony, or has been released from that prison term and is under a community control sanction regarding that felony.
> > >
> > > (ii) The offender was not sentenced to a prison term or sentence of death for the felony described in division (C)(1)(a) of this

section but was sentenced to a community control sanction for that felony and is under that community control sanction.

(iii) The felony described in division (C)(1)(a) of this section was a sexually oriented offense or child-victim oriented offense, and the offender has a duty to comply with sections 2950.04, 2950.041, 2950.05, and 2950.06 of the Revised Code relative to that felony.

**{¶12}** Lash is an eligible offender in accordance with R.C. 2953.72(C). R.C. 2953.71 through 2953.83 governs postconviction DNA testing for eligible inmates. R.C. 2953.73(D) provides as follows:

If an eligible offender submits an application for DNA testing under division (A) of this section, the court shall make the determination as to whether the application should be accepted or rejected. . . . The court shall make the determination in accordance with the criteria and procedures set forth in sections 2953.74 to 2953.81 of the Revised Code and, in making the determination, shall consider the application, the supporting affidavits, and the documentary evidence and, in addition to those materials, shall consider all the files and records pertaining to the proceedings against the applicant, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript and all responses to the application filed under division (C) of this section by a prosecuting attorney or the attorney general, unless the application and the files and records show the applicant is not entitled to DNA testing, in which case the application may be denied. . . . Upon making its determination, the court shall enter a judgment and order that either accepts or rejects the application and that includes within the judgment and order the reasons for the acceptance or rejection as applied to the criteria and procedures set forth in sections 2953.71 to 2953.81 of the Revised Code.

**{¶13}** This court has repeatedly held that the failure to provide an explanation for rejecting a defendant's application under R.C. 2953.73(D) is contrary to law and constitutes an abuse of discretion. *Connor*, 2020-Ohio-4310,

at ¶ 14 (8th Dist.), citing *State v. Rawls*, 2016-Ohio-7962, ¶ 25 (8th Dist.) (remanding to the trial court to provide its reasons for reaching its conclusion that DNA testing would not be outcome determinative); *State v. Richard*, 2013-Ohio-3918, ¶ 9 (8th Dist.) (remanding to the trial court to state its reasons for finding that DNA testing would not be outcome determinative where the court's journal entry stated, "Defendant's application for DNA testing . . . is denied, as it does not fulfill the requirement of the statute as to being 'outcome determinative'"); *State v. Smith*, 2007-Ohio-2369, ¶ 10 (8th Dist.) (remanding for further explanation where the trial court stated that it was denying the application because DNA testing would not be outcome determinative).

{¶14} Here, in our instant case, the trial court merely stated: "Defendant's motion for application for DNA testing is denied. Defendant has not shown that DNA testing would be outcome determinative. This court finds results would not be probative." However, the trial court does not provide its reasons or analysis for reaching its conclusion. This court has previously held that when the trial court's judgment fails to provide any reasons explaining how the court reached this conclusion, its decision is contrary to law and constitutes an abuse of discretion. *Richard* at ¶ 9.

{¶15} "The term 'outcome determinative' is a conclusion based upon consideration of all the available evidence. It is not a reason in and of itself." *Connor* at ¶ 15. "Therefore, the court is bound by R.C. 2953.73(D) to provide

reasons explaining how the court reached the 'outcome determinative' conclusion." *Richard* at ¶ 8. *See also Smith* at ¶ 8 (stating that when a trial court does not engage in an analysis of defense theories or provide the reasons on which it relied in reaching its conclusion that the DNA test would not be outcome determinative, its order is insufficient).

{¶16} Because the trial court's judgment in this case provides no basis or analysis for this court to review the trial court's decision, it is contrary to law and therefore constitutes an abuse of discretion. *Connor* at ¶ 16; *Smith* at ¶ 9.

{¶17} Therefore, Lash's assignment of error is sustained.

{¶18} Judgment reversed, and case remanded to the trial court to state its analysis for its conclusion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

MICHELLE J. SHEEHAN, P.J., and
EMANUELLA D. GROVES, J., CONCUR